UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

SCHOOL BOARD OF
THE CITY OF SUFFOLK,                    :
                                        :
             Plaintiff,                 :
                                        :
v.                                      :        No. 2:15cv18
                                        :
TERI A. ROSE, AS NEXT                   :
FRIEND OF C.A.R.,                       :
                                        :
             Defendant.                 :

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff School Board of the City of Suffolk ("Suffolk")
brought this suit appealing the decision of an impartial hearing
officer ("the hearing officer"), which resolved an Individuals
with Disabilities Education Act ("IDEA") due process complaint
submitted by Defendant, Teri A. Rose ("Rose"). See 20 U.S.C. §
1415(c), (f), and (i). The hearing officer ruled in favor of
Rose, finding that Suffolk denied Rose's son, C.R., a free and
appropriate education ("FAPE"), as required by the IDEA. C.R.
suffers from various psychological and learning impairments that
require him to receive special education. Suffolk alleges
several errors in the hearing officer's decision. The matter is
before the court on cross-motions for summary judgment on the
administrative record, which were referred to the undersigned
United States Magistrate Judge for recommended disposition. See
28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROPOSED FINDINGS OF FACT

At the time of the due process hearing in October 2014, C.R. was a fourteen year-old seventh-grader attending Rivermont School in Virginia Beach. See Hearing Tr. at 364, Test. of Dianne Rusnak (ECF No. 4-26, at 21). Since at least 2009, C.R.'s treating psychiatrist has consistently diagnosed C.R. with attention deficit hyperactivity disorder ("ADHD") and oppositional defiant disorder ("ODD"). See Dep. of L. Matthew Frank, M.D. (ECF No. 4-41, at 10-11); (ECF No. 4-42, at 15); Letter of Dr. Frank (ECF No. 4-44, at 20). C.R. also saw educational psychologist, Michael Jay Buxton, Ed.D., from age four onward. Hearing Tr. at 599 (ECF No. 4-36, at 6). Buxton diagnosed C.R. with ADHD, and later, post-traumatic stress disorder ("PTSD"), which Buxton attributed to bullying at school. See Hearing Tr. at 79, 638 (ECF No. 4-16, at 19) (Buxton discussing March 2011); (ECF No. 4-37, at 14). In addition to clinical diagnoses, Buxton testified that C.R.'s parents and he "felt that [C.R.] had a learning disability in math also." Hearing Tr. at 79 (ECF No. 4-16, at 19). From the administrative record, it appears the psychiatrist, psychologists, educators, parents, and the hearing officer do not agree on where C.R.'s psychological disorder falls along the

autism spectrum,[1] and accordingly, whether autism is the primary impairment inhibiting C.R.'s learning ability.

## A. Background Prior to March 2012

Prior to March 2012, C.R. attended Southwestern Elementary School in Suffolk's public school system. See, e.g., (ECF No. 4-1, at 1). He was first found eligible for special education and related services in January 2009.

Relevant to the chronology here, on March 4, 2011, Suffolk completed an individualized education program ("IEP") for C.R.'s special education services for the next calendar year. See March 2011 IEP (ECF No. 4-12, at 33). It called for: C.R.'s

---

[1] According to Austism Speaks, a non-profit autism advocacy organization,

> Autism spectrum disorder (ASD) and autism are both general terms for a group of complex disorders of brain development. These disorders are characterized, in varying degrees, by difficulties in social interaction, verbal and nonverbal communication and repetitive behaviors. With the May 2013 publication of the DSM-5 diagnostic manual, all autism disorders were merged into one umbrella diagnosis of ASD. Previously, they were recognized as distinct subtypes, including autistic disorder, childhood disintegrative disorder, pervasive developmental disorder-not otherwise specified (PDD-NOS) and Asperger syndrome.

Autism Speaks, What Is Autism?, https://www.autismspeaks.org/what-autism (last visited July __, 2015); see also Center for Disease Control and Prevention, Facts About ASD, http://www.cdc.gov/ncbddd/autism/facts.html ("A diagnosis of ASD now includes several conditions that used to be diagnosed separately: autistic disorder, pervasive developmental disorder not otherwise specified (PDD-NOS), and Asperger syndrome. These conditions are now all called autism spectrum disorder."). Accord Report of Rick Ellis, Ed.D., (ECF No. 4-13, at 14) (explaining that Pervasive Developmental Disorder ("PDD") is loosely used interchangeably with ASD to describe a continuum based on severity of the individual's impairment).

placement at Southwestern Elementary for the remainder of the 2010-2011 school year and the 2011-2012 school year; instruction services on written language, five times per week for forty minutes; and accommodations that included assistance with directions, breaks during tests, smaller group sizes, preferential seating, having directions read orally, and having test items read orally, all on an as-needed basis. (ECF No. 4-12, at 29-30). The March 2011 IEP identified C.R.'s areas of need as mathematics, behavioral skills, and handwriting. Id. at 26-28. The IEP listed his sole disability as "other health impairment." Id. at 22.

In January 2012, C.R. was due for his triannual comprehensive review for eligibility of special education services. See Hearing Tr. at 439 (ECF No. 4-30, at 10). Accordingly, a Suffolk re-evaluation committee referred C.R. to school psychologist Pamela Ivey. Id. at 438 (ECF No. 4-30, at 9). Ivey issued a psychological report on C.R.'s "current levels of functioning" in January 2012. Ivey Report (ECF No. 4-8, at 1). Ivey administered various tests to C.R., reviewed his records and a writing sample, observed C.R., and interviewed him. Id. at 2-3. Ivey's report reflected that C.R. generally scored in "low average range" on the tests designed to assess intellectual functioning, e.g., 14th percentile. Id. at 3, 6. His "overall Behavioral Symptom Index f[ell] in the Clinically

4

Significant range." Id. at 5. C.R.'s "Externalizing Problems composite [was] characterized by disruptive behavior problems such as aggression, hyperactivity, and delinquency," and thus, "was Clinically Significant in this domain." Id. Additionally, his teacher indicated that C.R. frequently annoyed others on purpose, teased others, and disrupted schoolwork. Id. Based on her observation and analysis, Ivey concluded that C.R. would likely benefit from being allowed to take oral tests, copying peers' notes, being given extended time for assignments, direct training on note-taking skills, and positive reinforcement, among other things. Id. at 7-8.

Following Ivey's report, Suffolk found C.R. eligible for continued receipt of special education under the disability categories: other health impairment (due to ADHD) and specific learning disability in written expression. See 20 C.F.R. § 300.8(c)(9) and (10).

## B. C.R.'s Departure from Southwestern Elementary

During the 2011-12 school year, C.R. was involved in two incidents at school, and on his school bus, characterized as "bullying." See, e.g., Hearing Tr. at 643-45 (ECF No. 4-37, at 19-21); id. at 653 (ECF No. 4-37, at 29). As described by Buxton, in the first instance in response to "being tormented by other children," C.R. "threatened to get . . . a sledgehammer and bash the youngster's head in" – "or something along the

5

order that he would severely injured [sic] or kill the other individual." Id. at 644 (ECF No. 4-37, at 20). Around February 15, 2012, Suffolk suspended C.R. for ten days for the incident. Due Process Hearing Request (July 2012) at 7 (ECF No. 4-8, at 25).

The second incident – which "precipitated the removal from Suffolk Public Schools" - involved another student "wiping boogers on C.'s seat" and someone stating "they were going to get a shotgun and shoot someone."[2] Hearing Tr. at 645 (ECF No. 4-37, at 21). It appears that in early 2012, the Roses "made frequent contacts with school teachers and administrators to advise them that [C.R.] was being bullied by N on an ongoing basis." Due Process Hearing Request (July 2012) at 7 (ECF No. 4-8, at 25). On February 17, 2012, the Roses gave Suffolk ten days' notice that they would withdraw C.R. from Southwestern Elementary and "seek reimbursement for a unilateral private placement" due to a perceived denial of FAPE. Id. at 7-8 (ECF No. 4-8, at 25-26); see 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb). Then, after discussions with Suffolk staff, the Roses "agreed to

---

[2] It is clear that that incident was the primary reason C.R. left Southwestern Elementary. Mr. Rose testified that "[t]he main reason why [the Roses] [] pulled C. from Suffolk Public Schools was over a bullying issue that had arisen and had been handled improperly." Hearing Tr. at 663 (ECF No. 4-38, at 9-10). The school's handling of the incident even resulted in a local newspaper article. See id. at 679-80 (ECF No. 4-38, at 25-26). Mrs. Rose testified though that they "chose [Chesapeake Bay Academy] because they had the smaller classroom and there was more teacher-student ratio." Id. at 20 (ECF No. 4-14, at 20).

have [C.R.] remain at SPS while more effective short-term IEP goals were developed." Id. at 8 (ECF No. 4-8, at 26). At the Roses' request, they and Suffolk executed a "Procedures for Reporting Incidents with Classmates" for C.R. to report bullying. Id. And, on February 29, 2012, the Roses and Dr. Buxton attended an IEP meeting, which did not result in an agreed upon placement. Id.

Then on March 6, 2012, the bus incident described above occurred where C.R. "told another student he would bring a gun on the bus and shoot them and that he wasn't afraid to use it." Id. Two days later, Southwestern's principal held a disciplinary meeting and suspended C.R. for one day. On March 15, 2012, the Roses withdrew C.R. from Southwestern Elementary and enrolled him at Chesapeake Bay Academy ("CBA"), see Hearing Tr. at 20 (ECF No. 4-14, at 20), following another failed IEP meeting. See Due Process Compl. at 8 (ECF No. 4-8, at 26). C.R. completed the 2011-12 school year at CBA. Id.

In July 2012, the Roses filed their first due process complaint under the IDEA in an effort to be reimbursed for the cost of CBA that spring and for the 2012-13 school year. See id. at 8-9. The due process complaint alleged that Suffolk had not set any goals "to develop social skills and pragmatic speech which [C.R.] lacks, are disability driven by his diagnosed ADHD, Asperger's, ODD, depression, and emotional liability . . . ."

7

Id. at 3 (ECF No. 4-8, at 21).   It alleged: "No bullying prevention plan; no acknowledgement of bullying issues. No services for SOL skills – failed SOLs. No ADHD accommodations. No mention, identification or service provision for diagnosed for [sic] emotional disabilities which adversely affect education performance and school behavior."   Id.

The Roses and Suffolk resolved the first complaint by an agreement dated July 23, 2012.   Under the agreement, Suffolk agreed to reimburse the Roses one half of the tuition they paid to CBA for March through June 2012 ($4,925), Resolution Agreement at 2 (ECF No. 4-13, at 2); and one half of the CBA tuition for the 2012-13 school year, id. at 3.   In the due process complaint that produced the agreement, the Roses had relied in part on a psychological evaluation conducted by C. Rick Ellis, Ed.D. in April 2012.   See id.[3]   Accordingly, as part of the resolution agreement, Suffolk and the Roses agreed to reconvene and reevaluate C.R. based on a review of Ellis's report, "to determine if based on new information, a change in [C.R.]'s special education eligibility is warranted." Resolution Agreement at 2 (ECF No. 4-13, at 2).   Finally, the Resolution Agreement provided that

> If Parents decide not to re-enroll [C.R.] in Suffolk
> Public Schools with the start of the 2013-2014 school

---

[3] It is unclear when Ellis delivered his report, but the test dates of C.R. were in April 2012.   See Ellis Report at 1 (ECF No. 4-13, at 30).

8

> year, but opt[] instead to have [C.R.] continue
> receiving services at Chesapeake Bay Academy or some
> other private school setting, it is expressly agreed
> to by the parties that Suffolk Public Schools will not
> have any financial responsibility whatsoever for any
> such unilateral placement decision made by Parents.

Id. at 3.

The parties reconvened August 8, 2012. See (ECF No. 1, at 1). The IEP team considered Ellis's report, which involved administering several objective tests to C.R. See Ellis Report at 2 (ECF No. 4-13, at 31). Ellis also reviewed C.R.'s prior records, teachers' reports, background information provided by his parents, and conducted a clinical interview. Id. at 1-2. Again, C.R. generally tested in the low average range for the various aspects of intellectual functioning. See id. at 3-5 (ECF No. 4-13, at 32-34). Also similar to previous reports, C.R.'s teachers and parents scored his behavioral and social skills in the "significant problem range." Id. at 7 (ECF NO. 4-13, at 36). Ellis found that C.R. met the DSM-IV criteria for Asperger's Syndrome and "into the general category of Pervasive Developmental Disorder (PDD)." Id. at 8, 9 (ECF No. 4-13, at 37, 38). As cited above, the May 2013 DSM-V removed Asperger's and PDD as stand-alone disorders and placed them under the general diagnosis of Autism Spectrum Disorder. See supra note 1. As Ellis noted in 2012, "the term [PDD] is being increasingly conceptualized as a continuum running from most

severe (e.g., Autistic Disorder), through varying degrees of severity, which extend to the high functioning edge of the spectrum." Ellis Report at 9 (ECF No. 4-13, at 38). Ellis opined that "[C.R.]'s PTSD symptoms of hypervigilance and intra-psychic confusion, combined with his ADHD distractibility will continue to dramatically compete with his ability to focus his attention and further diminish his ability to engage effectively in new learning." Id. at 10 (ECF No. 4-13, at 39). Ellis also concluded that C.R.'s Asperger's contributed to him being "easily overwhelmed by sensory input, including noise" but "in [his] opinion, in a secondary fashion." Id. at 9. "[C.R.]'s primary condition, Asperger's Syndrome, is a neurobiological disorder and it is not caused by environmental stress, parenting styles, or other situational factors although its expression and sequelle can be vastly worsened by insensitive and inappropriate environments." Id. In light of C.R.'s Asperger's, combined with his exhibition of PTSD symptoms, Ellis opined that "the extremely well-controlled and tranquil environment offered by Chesapeake Bay Academy appears to be the only appropriate and adequate environment for [C.R.] to recover from his previous educational traumas and avert having any additional losses." Id. at 10.

As a result of the August 2012 meeting, Suffolk and Mr. Rose[4] executed an updated IEP for C.R. that found him eligible for receipt of special education services under the disability categories: emotional disability, other health impairment (ADHD), and specific learning disability (written expression). See (ECF No. 4-1, at 4-5). Worksheets were completed for each category, see (ECF No. 4-1, at 7-9), and Suffolk laid out an IEP. See (ECF No. 4-5, at 1-18).

### C. The 2012-2013 School Year

In October 2012, while attending CBA, Mrs. Rose hospitalized C.R. for psychiatric evaluation, as a result of an incident. Hearing Tr. at 526-28 (ECF No. 4-32, at 25-27). Mrs. Rose testified that prior to a family outing, C.R. locked himself in her bedroom. Id. at 527. She unlocked the door, and C.R. held a BB gun and gestured like he was going to hit her with the butt end. Id. at 527-28. After calming him down, Mrs. Rose called Dr. Buxton and decided to take him to Maryview Hospital for an evaluation of his medications. Id. C.R. was hospitalized for a week. Id. at 528. The treating doctor at Maryview reported a conversation with Dr. Buxton and noted that his impression was "a mood disorder and an autistic spectrum

---

[4] Only Mr. Rose's signature appears on the reevaluation report. See (ECF No. 4-1, at 6); (ECF No. 4-5, at 1, 18).

disorder in the context of psychosis and learning problems."
Maryview Records (ECF No. 4-8, at 15).

In January 2013, the Roses and Suffolk held an IEP meeting
to discuss C.R.'s current IEP and transition services for the
following school year.   At the meeting, the Roses expressed
concern and opposition to transitioning C.R. back to Suffolk
schools.   Suffolk and the Roses scheduled an April 2013 meeting
"to review progress and discuss his transition to SPS."   (ECF
No. 4-5, at 24).

The next IEP team meeting occurred May 8, 2013.   See (ECF
No. 4-1, at 15).   At the meeting, Dr. Buxton and Mrs. Rose
expressed concern about C.R.'s "emotional stability" and
requested a clinical assessment before any readmission to
Suffolk Public Schools.   See (ECF No. 4-1, at 15-16).   At the
hearing, Buxton testified that during spring 2013, C.R. "would
get very, very upset" at the prospect of returning to public
school.   Hearing Tr. at 655 (ECF No. 4-38, at 1).   If required
to return to Suffolk public schools, C.R.'s "response was that
he would have to kill himself."   Id.

Suffolk agreed to obtain a clinical assessment of C.R.'s
risk of harm, but rejected Buxton and Rose's request for Ellis
to conduct the assessment.   Id. at 16.   The parties agreed that
Suffolk would provide the assessment "by a qualified mental
health provider unaffiliated with SPS or the parents."   Id.

Following the assessment, the IEP team planned to re-draft a transition plan and discuss extended school year (summer) services. Id. The parties agreed on Jennifer Gildea, Ph.D. to conduct the threat assessment. Hearing Tr. at 187 (ECF No. 4-20, at 3).

### D. Summer 2013

Dr. Gildea issued her assessment report June 11, 2013. See Gildea Report (ECF No. 25-1, at 1).[5] Specifically, Dr. Gildea conducted a "psychological evaluation to assess [C.R.'s] diagnostic concerns and his risks for posing harm to himself and others." Id. She conducted a clinical interview, reviewed records, and administered tests. See id. Gildea found that C.R. "struggled to exhibit age appropriate social skills during th[e] evaluation and, based on background information, testing results, and interview presentation, [C.R.] demonstrate[d] significant symptoms associated with an Autism Spectrum Disorder that complicate and contribute to other symptoms that he experiences." Id. at 14 (ECF No. 25-1, at 14). Her additional

---

[5] During the due process hearing, the hearing officer admitted an email from Dr. Gildea summarizing her key findings, but sustained a hearsay objection from Rose's counsel to the admission of Gildea's report. Hearing Tr. at 270 (ECF No. 4-23, at 32). But see Fed. R. Evid. 803(4)(excepting from the rule against hearsay a "statement that (A) is made for - and is reasonably pertinent to - medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause."). However, at oral argument on the cross-motions for summary judgment, the undersigned granted Suffolk's request to receive additional evidence and admitted Gildea's report. See 20 U.S.C. § 1415(i)(2)(C)(ii) (governing new evidence on appeal).

diagnoses included: a Major Depressive Disorder, PTSD, ADHD, and a learning disorder. Id. Gildea opined that "[l]arger social gatherings, larger classroom environments, exposure to more aggressive and behaviorally challenged peers, disruptions in his structure and routine, unpredictable changes, and a high level of expressed stress and emotion" all place C.R. "at high risk for depression, anxiety, anger, and aggression, and to engage in further threatening behaviors, including either verbal or physical threats." Id. Accordingly, Gildea recommended, among other things, avoiding abrupt changes in C.R.'s school placement and developing "safety plans, and interventions strategies" with C.R.'s teachers. Id. at 16. She also noted that C.R. would benefit from "continued one-on-one assistance, reduced stimulation at school, aid in transitioning between tasks, the ability to complete some tasks in a separate, quieter setting, . . . or the ability to go to a 'cool down' area when he becomes agitated or distressed, and before he becomes aggressive, in the classroom." Id.

Following Gildea's report, Suffolk and the Roses held an IEP meeting June 12, 2013. The resulting IEP called for C.R. to receive extended school year services at CBA from June 24, 2013 through August 2, 2013. See (ECF No. 4-1, at 22). The goals for C.R. focused on writing and organizational skills, social development and conflict management, and staying on task. See

14

(ECF No. 4-1, at 22, 29, 32).   C.R.'s disabilities remained: emotional disability, other health impairment (ADHD), and specific learning disability (written expression).  See (ECF No. 4-1, at 25).[6]

On August 1 and 13, 2013, the parties held meetings to develop an annual IEP for the 2013-14 school year.   At the August 1 meeting, Judy Jankowski, who became the head of CBA in June 2013, advised Suffolk and the Roses that C.R. would not be able to continue attending CBA.  Hearing Tr. at 119-20 (ECF No. 4-17, at 28).   Jankowski had recently learned of C.R.'s designation as emotionally disabled, which placed C.R. in a category of children CBA is not licensed by the Commonwealth to serve.  Id.  In addition, Jankowski testified that CBA staff made her aware of "issues that were of significant enough concern to me that I did not feel it was appropriate for [C.R.] to continue." Id.  Referencing the threat risk identified in Gildea's and Ellis's reports, Jankowski testified that there were so many reasons she did not want C.R. at CBA, "it's hard to enumerate them all." Id. at 120 (ECF No. 4-17, at 29).

---

[6] Per meeting log notes, Ms. Rose attended the June 12, 2013 meeting, but due to printing difficulties at CBA, she was unable to sign the original IEP.  (ECF No. 4-1, at 21).  Accordingly, Suffolk sent the IEP home to be signed by Ms. Rose.  Id.  She signed the IEP June 20, 2013 with several hand-written additions, but consented to extended school year services at CBA.  (ECF No. 4-2, at 2-3, 18).  Dr. Hickman testified that the IEP from the June 12, 2013 was in draft form and the parents wanted to take it home for review.  (ECF No. 4-24, at 1). And, the committee never agreed to the additions and changes Ms. Rose made.  Id. at 2.

Accordingly, at the August meetings, CBA made everyone aware that C.R. would not be re-enrolled. See, e.g., IEP Proposed Action (ECF No. 4-3, at 26) ("August 2, 2013, is the last day that [C.R.] could attend CBA."); Certified Mail Receipt and Letter from Jankowski to Rose (ECF No. 4-13, at 42).

During those meetings, both Suffolk and the Roses agreed that Forest Glen Middle School, the regular public school C.R. would have otherwise attended, was not an appropriate placement. Hearing Tr. at 285-86 (ECF No. 4-24, at 12-13) (Dr. Hickman testifying).  Suffolk proposed Rivers Bend Academy, but the Roses did not consent to that placement.  (ECF No. 4-3, at 19). Despite CBA's refusal to admit him, the Roses consistently wanted C.R. at CBA.  The Roses rejected all of Suffolk's other proposals: SECEP Re-Ed, Oyster Point Academy, and Rivermont School.  See (ECF No. 4-3, at 26).

At the August 13, 2013 meeting, Rose first took the position she has advanced through this litigation: that C.R. was not properly labeled and should not be eligible for special education services for Emotional Disability, but rather Autism. See 34 C.F.R. § 300.8(c)(1), (4).  At that meeting, Suffolk agreed to conduct a reevaluation to consider: (i) whether C.R. met the eligibility requirements for math disability, (ii) whether C.R. continued to be eligible as a student with an emotional disability, and (iii) whether C.R. meets the

eligibility criteria for a student with autism.  Hearing Tr. at 452 (ECF No. 23) (school psychologist Jeffrey Benton testifying).  They held the reevaluation meeting September 5, 2013.

Mr. Benton, a Suffolk school psychologist, recalled that after "much discussion" on whether C.R. was correctly categorized as emotionally disabled, "as a committee we agreed eventually that [C.R.'s category] was not currently appropriate," Id. at 456 (ECF No. 4-30, at 27).  Dr. Buxton and Rose argued that C.R. should receive special education services as a child with autism.  Id. at 456-57 (ECF No. 4-30, at 27-28). Accordingly, Suffolk proposed an evaluation by the school psychologist to identify the correct disability label for C.R. because the committee did not feel it had enough information. Id. at 457 (ECF No. 4-30, at 28) ("to distinguish between the characteristics of autism versus an emotional disability"). However, Rose requested more time to consider her options and expressed concerns about the effect of another evaluation on C.R.  Rose never consented to an evaluation.  See id. at 464 (ECF No. 4-30, at 35).

### E. The 2013-2014 School Year

After CBA refused C.R. readmission and the Roses rejected the Rivers Bend Academy placement, C.R. did not attend any school for sixty-nine (69) days in the fall of 2013.  Hearing

Tr. at 293 (ECF No. 4-24, at 20). Suffolk then filed a truancy petition. Id. And, Dr. Buxton filed a request for C.R. to receive homebound services. Id. Accordingly, the IEP team held a meeting December 16, 2013.

Suffolk again proposed Rivers Bend Academy as an appropriate placement constituting the least restrictive environment for C.R.'s disabilities. (ECF No. 4-11, at 43); see 34 C.F.R. § 300.114. Nevertheless, Suffolk agreed to authorize homebound services from January 6, 2014 through March 7, 2014. Id. Rose again signed off on the IEP, which further provided that "[a]t the conclusion of the 9 weeks, [C.R.] will have the option of attending either Forest Glen Middle School (if it is determined that [C.R.] is no longer a threat to himself or others in the public school setting) or Rivers Bend Academy . . . ." Id.

C.R.'s homebound services ended March 7, 2014. An IEP meeting was then set for May 8, 2014. At the May 8 meeting, Rose continued to express her disagreement with the disability category of emotional disability, and Suffolk amended its recommendation from Rivers Bend Academy to Rivermont School. See (ECF No. 4-6, at 9, 15). Rose agreed to send C.R. to Rivermont for extended school year services for the summer of 2014. (ECF No. 4-6, at 18). And, as a result of C.R.'s having only 9 weeks of instruction for the 2013-14 school year,

18

everyone agreed that he would repeat 7th grade for the 2014-15 school year. (ECF No. 4-6, at 13).

Another IEP meeting was held June 11, 2014 to develop goals and objectives for the following school year. Rose agreed to C.R.'s placement at Rivermont for the 2014-15 school year, but again voiced her disagreement over the emotionally disabled label. (ECF No. 4-7, at 24-26). Rose requested a reevaluation of C.R., and Suffolk agreed to schedule a reevaluation meeting. (ECF No. 4-7, at 26).

### F. The 2014-2015 School Year[7]

Rose requested a due process hearing August 7, 2014. The hearing officer held the hearing in October 2014 to resolve three issues: (i) whether Suffolk denied C.R. a FAPE; (ii) whether C.R. was properly identified as emotionally disabled; and (iii) whether C.R.'s placement at Rivermont was "proper." Pre-Hearing Report (ECF No. 4-45, at 2).

The hearing officer received testimony from eleven witnesses over four days, and concluded that Suffolk denied C.R. a FAPE; that C.R. was not properly designated as having an emotional disability; and that C.R.'s placement at Rivermont was not the least restrictive environment. See Hearing Officer

---

[7] C.R. attended Rivermont for the 2014-15 school year, where one of his teachers reported C.R. has thrown items, like pencils or his hat, at peers and been "verbally disruptive," but has not gotten in any fights. (ECF No. 4-34, at 7).

Decision (ECF No. 4-46).[8] The hearing officer "deemed [C.R.] an autistic child, not a child who has an emotional disability," directed Suffolk to "delete the ED label from [C.R.]'s educational record," and held that his placement at Rivermont was "improper." (ECF No. 4-46, at 19). In addition, the hearing officer directied Dr. Ellis to make an immediate determination of C.R.'s "current mental status and ability to attend school without injury to himself or others." Id. The hearing officer then declared that if either Ellis finds C.R. poses a risk or CBA "is no longer available to [C.R.]," Rose "may select an alternate Private Day School" for C.R. that conforms to his special education needs. Id. Notwithstanding the post-hearing evaluation she directed and her recognition that CBA may not be available to C.R., the hearing officer "deemed [CBA] the least restrictive environment for his educational service delivery," and purported to "affirm placement at [CBA] until [C.R.] graduates on or about June 14, 2019 or until he leaves [Suffolk], whichever shall first occur." Id. Finally, the hearing officer ordered Suffolk to reimburse Rose for tuition and transportation as "the FAPT team" deems appropriate. Id.

---

[8] The hearing officer also made some extraneous findings that the undersigned need not address, such as: "The Hearing Officer does not condone [Buxton]'s prior contentious stance and recommends that [Buxton] make an apology to [Suffolk] . . . for making certain unwise remarks to them." (ECF No. 4-46, at 19).

Suffolk then filed a complaint in this court seeking judicial review of the hearing officer's decision, and alleging several errors. (ECF No. 1).

## II. APPLICABLE LAW

Congress enacted the IDEA to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living." 20 U.S.C. § 1400(d)(1)(A). To meet its goal, the IDEA requires public schools receiving federal funding to provide every disabled child a FAPE specially designed to meet his or her unique needs. 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1)(A), 1413(a)(1); Sumter Cnty. Sch. Dist. 17 v. Heffernan, 642 F.3d 478, 483 (4th Cir. 2011).

Specifically,

> The term "free appropriate public education" means special education and related services that -- (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of [] title [20].

20 U.S.C. § 1401(9). And,

> Child with a disability means a child evaluated in accordance with [20 C.F.R.] §§ 300.304 through 300.311

as having mental retardation, a hearing impairment
(including deafness), a speech or language impairment,
a visual impairment (including blindness), a serious
emotional disturbance (referred to in this part as
"emotional disturbance"), an orthopedic impairment,
autism, traumatic brain injury, an other health
impairment, a specific learning disability, deaf-
blindness, or multiple disabilities, and who, by
reason thereof, needs special education and related
services.

34 C.F.R. § 300.8(a)(1).

A local educational agency[9] like Suffolk fulfills this

obligation when it provides that child with "personalized

instruction with sufficient support services to permit the child

to benefit educationally from that instruction." Bd. of Educ.

of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v.

Rowley, 458 U.S. 176, 203 (1982).   This is accomplished, at

least in part, by the creation of an IEP for each disabled

child.   20 U.S.C. § 1414(d)(1)(A); see also Schaffer ex rel.

Schaffer v. Weast, 546 U.S. 49, 53 (2005) ("the central vehicle

for this collaboration [between parents and schools] is the IEP

process.").   An IEP is a written statement for each child that

must outline his "then-current educational status, establish

---

[9] "The term 'local educational agency' means a public board of
education or other public authority legally constituted within a State
for either administrative control or direction of, or to perform a
service function for, public elementary schools or secondary schools
in a city, county, township, school district, or other political
subdivision of a State, or for such combination of school districts or
counties as are recognized in a State as an administrative agency for
its public elementary schools or secondary schools." 20 U.S.C. §
1401(19)(A).

annual goals, and detail the special educational services and other aids that the child will be provided." A.K. ex rel. J.K. v. Alexandria City Sch. Bd., 484 F.3d 672, 675 (4th Cir. 2007); see § 1414(d)(1)(A).   And, it must be "reasonably calculated to enable the child to receive educational benefits."  Rowley, 458 U.S. at 207.

"Importantly, the IDEA does not rely solely on the IEP requirement to achieve the goal of a FAPE; additionally, the IDEA provides a range of procedural safeguards to ensure parental participation in the process."   Fitzgerald v. Fairfax Cnty. Sch. Bd., 556 F. Supp. 2d 543, 551 (E.D. Va. 2008).   As the Supreme Court has explained, "[p]arents and guardians play a significant role in the IEP process." Schaffer, 546 U.S. at 53.

> They must be informed about and consent to evaluations of their child under the Act. § 1414(c)(3). Parents are included as members of "IEP teams." § 1414(d)(1)(B). They have the right to examine any records relating to their child, and to obtain an "independent educational evaluation of the[ir] child." § 1415(b)(1). They must be given written prior notice of any changes in an IEP, § 1415(b)(3), and be notified in writing of the procedural safeguards available to them under the Act, § 1415(d)(1). If parents believe that an IEP is not appropriate, they [as well as school districts] may seek an administrative "impartial due process hearing." § 1415(f).

Id.

While Congress intended parents to be actively involved in decisions regarding their child's education, this involvement

does not rise to the level of a "parental veto." See id. In other words, "the IDEA is designed to ensure parental participation in decisions regarding their disabled child, but it does not ordinarily require parental consent such that parents may usurp or otherwise hinder an LEA's authority to educate" disabled children. Id. The IEP process and its resulting plan under the "IDEA does not, however, require a school district to provide a disabled child with the best possible education." MM ex rel. DM v. Sch. Dist. of Greenville Cnty., 303 F.3d 523, 526 (4th Cir. 2002) (citing Board of Education v. Rowley, 458 U.S. 176, 192 (1982)). "And once a FAPE is offered, the school district need not offer additional educational services . . . - the Act does not require the furnishing of every special service necessary to maximize each handicapped child's potential." Id. (internal marks and citations omitted). Rather, the "intent of the Act" focuses on "open[ing] the door of public education to" children with disabilities. Board of Educ. v. Rowley, 458 U.S. 176, 192 (1982).

Consequently, an alleged procedural violation of the IDEA, without more, is insufficient to show a school failed to provide a child with a FAPE. Rather, when procedural violations are alleged, they "must actually interfere with the provision of a FAPE to that child." DiBuo ex rel. DiBuo v. Bd. of Educ. of

Worcester    Cnty., 309    F.3d    184,    190    (4th    Cir.    2002).
Specifically,

> In matters alleging a procedural violation, a hearing
> officer may find that a child did not receive a free
> appropriate public education only if the procedural
> inadequacies - (I) impeded the child's right to a free
> appropriate   public   education;   (II)   significantly
> impeded the parents' opportunity to participate in the
> decisionmaking process regarding the provision of a
> free   appropriate   public   education   to   the   parents'
> child; or (III) caused a deprivation of educational
> benefits.

§ 1415(f)(3)(E)(ii).   That is, if the court or hearing officer

finds a violation of the IDEA's procedural safeguards, the court

must determine "whether [the procedural violation] resulted in

the loss of an educational opportunity for the disabled child,

or whether, on the other hand, it was a mere technical

contravention of the IDEA." M.M., 303 F.3d at 533; see also

A.K., 484 F.3d at 679 n.7 (procedural violations subject to

harmless error standard).

On the other hand, when the error alleged is "a substantive

one," the relevant question for the Court is "whether the IEP

was reasonably calculated to enable the child to receive

educational benefits, or stated another way, was the IEP

sufficient to confer 'some educational benefit' upon the

handicapped child." MM, 303 F.3d at 531.   "And in these cases,

the courts should endeavor to rely upon objective factors, such

as    actual    educational    progress,    in    order    to    avoid

'substitut[ing] [our] own notions of sound educational policy for those of the school authorities which [we] review.'" Id. at 532 (quoting Hartmann v. Loudoun Cnty. Bd. of Educ., 118 F.3d 996, 1000 (4th Cir. 1997)).   With this statutory framework in mind, Suffolk argues that the hearing officer erred in revising C.R.'s educational disability and directing he attend CBA.   It also contends the hearing officer exceeded her authority in purporting to permit C.R. to attend CBA through 2019.

### III. STANDARD OF REVIEW

A district court reviewing a state administrative decision under the IDEA may grant summary judgment on the administrative record.   See Hogan v. Fairfax Cnty. Sch. Bd., 645 F. Supp. 2d 554, 561 (E.D. Va. 2009); Fitzgerald, 556 F. Supp. 2d at 550. In reviewing the administrative decision, a district court engages in a modified de novo review, making an "independent decision based on a preponderance of the evidence . . .," Doyle v. Arlington Cnty. Sch. Bd., 953 F.2d 100, 103 (4th Cir. 1991), "albeit one generally cabined by the record of the administrative proceedings." E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ., 773 F.3d 509, 516-17 (4th Cir. 2014).   Explicitly, the IDEA directs that "the court -- (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the

evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

Although "the findings of fact and ultimate decision as to whether the state has complied with the IDEA are made by the district court," the court must afford the administrative findings "due weight." Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. TH, 642 F.3d 478, 484-85 (4th Cir. 2011) (quoting Doyle, 953 F.2d at 103). "'Due weight' means that administrative findings 'are entitled to be considered prima facie correct, akin to the traditional sense of permitting a result to be based on such fact-finding, but not requiring it.'" Id. (quoting Doyle, 953 F.2d at 105). Because the district court lacks the opportunity to assess the credibility of the evidence presented at the hearing, the court must explain any deviation from the administrative findings. See id. at 485; see also M.M., 303 F.3d at 530-31. And, "in this circuit the determination of whether an IEP is appropriate is a question of fact." A.B. ex rel. D.B. v. Lawson, 354 F.3d 315, 327 (4th Cir. 2004) (citations omitted). Finally, the party challenging the administrative decision bears the burden of proof in the district court. A.K., 484 F.3d at 679.

## IV. DISCUSSION

The central issue presented to the hearing officer was whether Suffolk denied C.R. a FAPE by including in his IEP the

disability of "emotionally disabled" or "emotionally disturbed," as that term is defined in the Code of Federal Regulations.[10] The hearing officer concluded that Suffolk denied C.R. a FAPE because C.R. is "primarily autistic," not emotionally disabled and "because [the IEP was] not the product of collegial information objectively shared between [Suffolk, Buxton,] and the Independent Evaluators." (ECF No. 4-46, at 6, 15).

Following the hearing officer's ruling, Suffolk filed this civil action, pursuant to 20 U.S.C. § 1415(i)(2). That subsection provides that upon reviewing the administrative record and taking additional evidence at the request of a party, the court "basing its decision on a preponderance of the evidence, shall grant <u>such relief as the court determines is appropriate</u>." § 1415(i)(2)(C)(iii). Accordingly, the court is not bound to either a simple affirmance or reversal of the hearing officer's decision. <u>See</u> <u>Doyle</u>, 953 F.2d at 105. Rather, "[a]fter giving the administrative fact-findings such due weight, if any, the district court then is free to decide the case on the preponderance of the evidence, as required by

---

[10] Suffolk's form IEP's all list "Emotional Disability" as the box to be checked, but the regulations use the term "emotional disturbance." <u>Compare</u> (ECF No. 4-1, at 4), <u>with</u> 34 C.F.R. § 300.8(c)(4)(i). Nevertheless, Suffolk's continually used Emotional Disability Worksheet analyzes the conditions set forth in the regulations and cites § 300.8. <u>See</u> (ECF No. 4-1, at 7). Accordingly, this report will use the terms interchangeably.

the statute." Id. Several circumstances of this case counsel in favor of a narrow ruling and order from this court.

First, the court received additional evidence at the request of both parties: the Gildea report, a letter from Dr. Ellis reporting his findings on C.R.'s current threat risk - as directed by the hearing officer, and a letter from Dr. Jankowski of CBA which makes it explicitly clear that C.R. will not be able to re-enroll there, regardless of his disability label or threat risk. See § 1415(i)(2)(C)(ii); Hearing Officer Order (ECF No. 4-46, at 19). Because CBA is not available to C.R., much of the relief directed by the hearing officer was beyond her power to order. Unlike cases where a party seeks purely backward-looking relief, such as reimbursement for a past private school placement, the parties here seek some kind of prospective relief. But CBA's position declining C.R.'s reenrollment renders moot much of the relief anticipated by the hearing officer's decision. Indeed, as C.R. is presently enrolled at Rivermont, and the parties concede that he cannot receive a FAPE at an ordinary public middle school, it is not entirely clear the scope of relief Suffolk seeks. See Compl. ¶ 40 (ECF No. 1, at 35) ("[T]he School Board prays that its appeal be sustained and that judgment be entered for the School Board and that the School Board recover its costs."); Hearing Tr. at 701-02 (ECF No. 4-39, at 17-18) (Dr Hickman: "we all agree that

29

. . . the public school setting is not appropriate. . . . We will continue to support the Rivermont placement or any other placement that is licensed and has the program for C."). Because the hearing officer's ruling rested largely on a contingency - that CBA be available as an option for C.R. - that has not occurred, <u>see</u> Jankowski Letter (ECF No. 26), the conclusion that CBA was an appropriate placement, providing the least restrictive environment, is moot. Likewise, the questionably ultra vires order that C.R. stay at CBA until 2019 is likewise moot.[11]  See 20 U.S.C. § 1414(a)(2)(B)(ii) (requiring reevaluation "at least once every 3 years").

With those considerations in mind, the undersigned will analyze what relief is appropriate in this case.

---

[11]  This court has no authority to order CBA, a non-party, to re-enroll C.R.  <u>See</u> Fed. R. Civ. P. 65(d).  Additionally, CBA is a private school that receives no federal funding.  It is not subject to the IDEA's mandate, which applies to local educational agencies of States eligible for the federal government's monetary assistance.  <u>See</u> 20 U.S.C. § 1412(a), 1412(a)(11) ("The State educational agency is responsible for ensuring that the requirements of this subchapter are met."); <u>id.</u> § 1401(19) (defining "local educational agency"); <u>Forest Grove Sch. Dist. v. T.A.</u>, 557 U.S. 230, 232 (2009) (noting that federal funding triggers IDEA obligations); Hearing Tr. at 134 (ECF No. 4-18, at 12) (Jankowski testifying that CBA receives no federal funding).

**A. Given that the Hearing Officer's Factual Findings Are Prima Facie Correct, a Preponderance of the Evidence Elicited at the Due Process Hearing Supports a Finding that an Emotional Disability Did Not Have the Primary Adverse Effect on C.R.'s Educational Performance.**

"[F]indings of fact by the hearing officers in cases such as these are entitled to be considered prima facie correct," so long as they are "regularly made." Doyle, 953 F.2d at 105. That is, the "reviewing court should examine the way in which the state administrative authorities have arrived at their administrative decision and the methods employed." Id. And if the way in which the hearing officer made those findings does not depart from "the fact-finding norm," the facts found are entitled to "due weight." Id.

Here, the hearing officer heard evidence from witnesses on direct, cross, and re-direct examination; admitted documentary evidence; ruled on objections; considered a deposition taken de bene esse; and rendered a written final decision. Because that procedure did not depart from the norms of judicial fact-finding, it is entitled to due weight in these proceedings. Accordingly, the burden here is on the plaintiff Suffolk to show that despite deference to the hearing officer's findings, a preponderance of the evidence supports a contrary finding – that C.R.'s 2013-14 IEP including his principal educational impairment of emotional disability was appropriate. Suffolk has not carried its burden. Principally, the evidence elicited at

31

the due process hearing supports a finding that one of C.R.'s disabilities under the IDEA should be autism. Given the substantial overlap among behaviors associated with the two conditions, a preponderance of the evidence also supports the hearing officer's conclusion that C.R.'s autism is the primary factor which affects his educational performance.

The Department of Education has promulgated regulations to implement the IDEA. Those regulations expand on the IDEA's definition of a "child with a disability." See 34 C.F.R. § 300.8(a)(1); 20 U.S.C. § 1401(3)(A). The statute's definition is comprised of a list specific disabilities, including among others, autism, emotional disturbance, specific learning disability, and other health impairment. See 20 U.S.C. § 1401(3)(A) (defining "child with a disability" generally); D.B. v. Bedford Cnty. Sch. Bd., 708 F. Supp. 2d 564, 578 (W.D. Va. 2010) ("[T]he disabilities listed in § 1401(3)(A) are distinct and separate . . . ."). The C.F.R. then defines the disability terms found in the statutory definition. See § 300.8.

The parties do not dispute that C.R. is appropriately designated as having an "other health impairment" by virtue of his ADHD, see id. § 300.8(c)(9), and a specific learning disability in written expression, see id. § 300.8(c)(10)(i). However, Suffolk has designated C.R. as disabled by an emotional disturbance and contends that this designation remains

32

appropriate.   Rose  argues  that  C.R.  is  not  appropriately designated  as  having  an  emotional  disturbance.   Further,  Rose argues  that  the  IEP  team  should  designate  C.R.  as  disabled  by autism.

> The Department of Education regulations state:

> Autism means a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age three, that adversely affects a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences.

24  C.F.R.  §  300.8(c)(1)(i).   However,  under  the  regulations "Autism does not apply if a child's educational performance is adversely affected primarily because the child has an emotional disturbance,  as  defined  [by  the  regulations]."   <u>Id.</u>  § 300.8(c)(1)(ii).   In turn,

> Emotional disturbance means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:

> (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.

> (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

> (C) Inappropriate types of behavior or feelings under normal circumstances.

> (D) A general pervasive mood of unhappiness or depression.

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

Id. § 300.8(c)(4)(i); see also Springer v. Fairfax Cnty. Sch. Bd., 134 F.3d 659, 663 (4th Cir. 1998) (delineating the minimum conditions necessary for a finding of emotional disturbance). Thus, if the primary adverse effect on a child's educational performance is his emotional disturbance, then the regulations require that he not be designated autistic.   But, nothing prevents an IEP team from designating a child as both emotionally disabled and autistic, if the primary adverse effect on his educational performance is something other than the emotional disability.   See id. § 300.8(c)(1)(ii).   The issue for C.R. then is whether he has an emotional disturbance, and if so, whether that condition is the primary adverse effect on his educational performance.   Assuming C.R. does meet the criteria for an emotional disturbance designation, a preponderance of the evidence in the record establishes that, his educational performance is not "adversely affected primarily because [he] has an emotional disturbance." § 300.8(c)(1)(ii).   According to three psychology experts who personally evaluated him, C.R.'s primary problem affecting his educational performance is either his other health impairment – ADHD, or autism.

Three psychologists, Buxton, Ellis, and Gildea, opined that C.R. suffered from an autism spectrum disorder.   As a result,

the hearing officer was "convinced that the Child is primarily autistic and that it is this factor that adversely affects academic performance." (ECF No. 4-46, at 6). Those three psychologists and C.R.'s treating psychiatrist, Dr. Frank, also diagnosed C.R. with ADHD. See (ECF No. 25-1, at 14) (Gildea); (ECF No. 4-41, at 10-11) (Frank); (ECF No. 4-16, at 19) (Buxton - "severe ADHD"); (ECF No. 4-13, at 39) (Ellis). Buxton and Ellis unequivocally opined that C.R. did not have an emotional disturbance. Hearing Tr. at 76 (ECF No. 4-16, at 16) (Buxton); Ellis Letter Sept. 4, 2013 (ECF No. 4-13, at 41) ("My evaluation found [C.R.] did not meet the criteria for Severely Emotionally Disabled. My evaluation strongly confirms the diagnosis of autistic spectrum disorder."). Dr. Frank, the psychiatrist, testified that there is no medical term that corresponds to "emotional disturbance," and he does not use the term as a medical diagnosis. (ECF No. 4-42, at 14-15). He asserted:

> A: These are very, very general descriptors here that I'm not sure translate into specific medical terms very easily.
>
> Q: So you are not able to express a medical opinion regarding emotional disturbance?
>
> A: No. My medical opinion is very clear, he has ADHD, ODD, and LD.

(ECF No. 4-42, at 15).

The hearing officer heard considerable testimony, including expert testimony, and considered several exhibits of documentary

evidence, including Ellis's report. Although her written report lacks detailed analysis of this testimony, she nonetheless concluded firmly that C.R. was not primarily emotionally disabled. Those administrative "proceedings must command considerable deference in federal courts." Hartmann by Hartmann v. Loudoun Cnty. Bd. of Educ., 118 F.3d 996, 1002 (4th Cir. 1997). Accordingly, a preponderance of the evidence supports a finding consistent with the hearing officer's conclusion - emotional disturbance is not the primary cause of C.R.'s strained educational performance. The expert testimony, heard directly by the hearing officer, is consistent and credible evidence supporting this conclusion. Suffolk has not demonstrated that the hearing officer's finding on that point should be disturbed.

Indeed, Suffolk presented little expert evidence to support its contention that it appropriately designated C.R. as emotionally disabled. Suffolk's primary evidence that C.R.'s primary disability was an emotional one appears to have been C.R.'s own statements, related by Buxton and others, that he would kill himself if he had to return to public school. His suicidal and homicidal threats, as reported by Dr. Gildea, Dr. Buxton, and the Roses are evidence of "inappropriate types of behavior" and an "inability to build or maintain satisfactory interpersonal relationships with peers and teachers." 34 C.F.R.

§ 300.8(c)(4)(i)(B)-(C); <u>see, e.g.</u>, (ECF No. 4-23, at 24-25, 30). Suffolk also relied on the school psychologist, Ms. Ivey's expert opinion that C.R. "was appropriately identified by the re-evaluation committee . . . as having an emotional disability." (ECF No. 4-29, at 33). Ivey testified that C.R.'s "aggressive behaviors . . . in addition to [an] inability to build or maintain satisfactory relationship[s] with peers and teachers" had the greatest impact on is educational performance. <u>Id.</u> In addition, Suffolk pointed to the homebound teacher's testimony that C.R.'s defiant behavior affected his ability to learn. (ECF No. 4-34, at 16). Suffolk also offered the testimony of Rivermont's principal, Fiesta Martin. She testified that C.R.'s disruptive behavior – such as throwing pencils and verbal outbursts - does in fact impede his learning. (ECF No. 4-34, at 7-8). Notwithstanding Suffolk's factual evidence and opinion testimony, the hearing officer's decision is supported by a preponderance of the evidence.

Notably, the broad overlap in diagnostic factors the Department of Education promulgated for emotional disturbance versus autism makes the inquiry particularly ripe for the aid of expert testimony and first-hand fact finding. Dr. Frank's testimony highlights this point. He testified that the criteria referenced by the C.F.R. are "very, very general descriptors." (ECF No. 4-42, at 15). <u>Compare</u> § 300.8(c)(1)(i) ("unusual

37

responses to sensory experiences" – autism), with §
300.8(c)(4)(i)(C)("Inappropriate types of behavior or feelings
under normal circumstances" – emotional disturbance). As a
result, the overlap between the two designations, as well as the
"sine qua non" of ADHD - easy distractibility and need for
constant redirection, makes concluding that emotional
disturbance is the primary factor in C.R.'s educational problems
all the more difficult. (ECF No. 4-42, at 16). Because of that
difficulty, this court should give deference to the hearing
officer, who had direct access to the experts trained in
educational psychology.

Springer v. Fairfax Cnty. Sch. Bd. offers a helpful
comparison. The child at issue in Springer presented the
mirror-opposite situation. There, the child had never received
special education services throughout his academic career nor
demonstrated any need for them. 134 F.3d at 661. Then in
eleventh grade, the child began a series of delinquent behaviors
stealing cars, skipping class, smoking marijuana, and failing
several exams. Id. In response, his parents placed him in a
private residential school and sought reimbursement for the
school's cost from Fairfax, alleging that the child was
emotionally disturbed. Id. Ultimately, the court held that the
child did not meet the criteria for having an emotional
disturbance. In making that finding the court relied heavily on

38

the volume of expert psychological evidence. _Id._ at 662 ("abundant psychological evidence that [the child] did not have a serious emotional disturbance"), ("Several separate evaluations of [the child] had uniformly supported the conclusion that . . . he exhibited no symptoms of a serious emotional disturbance."); _id._ at 665 ("overwhelming consensus among the psychologists who examined [the child]"). In short, psychological evaluations are strong evidence of the appropriateness of an eligibility determination. And here, the hearing officer credited the psychological evaluations of Ellis, Buxton, and Gildea, each of whom opined that C.R. was primarily suffering from ADHD and autism. Most persuasively, the opinion of the second independent evaluator, Dr. Gildea, reinforced the conclusion of Drs. Ellis and Buxton. With the hearing officer's decision afforded due weight, Suffolk has "given [the court] no reason to doubt this professional consensus." _Id._ at 665.

Against this consensus Suffolk relied almost entirely on the opinion of its own school psychologist. _See, e.g._, Pl.'s Br. (ECF No. 17, at 33). While the hearing officer does not simply undertake a quantitative weighing of the evidence, the volume and uniformity of expert evidence presented by Rose supports a preponderance finding that autism is C.R.'s primary educational impediment. Although Suffolk's educators are entitled to deference in their decision-making, "[t]he respect

39

and deference that must be accorded to those professional opinions, however, does not give a district court license to ignore the requirement of <u>Rowley</u> and <u>Doyle</u> that the findings of the <u>administrative proceeding</u> must be given due weight." <u>Cnty. Sch. Bd. of Henrico Cnty., Virginia v. Z.P. ex rel. R.P.</u>, 399 F.3d 298, 307 (4th Cir. 2005) (emphasis in original). Indeed, Suffolk appears to be the only party of the IEP team still contesting the emotional disturbance designation. Moreover, even if C.R. meets the criteria for having an emotional disturbance, a preponderance of the evidence supports the hearing officer's conclusion that an emotional disturbance is not what primarily adversely affects C.R.'s educational performance.

A preponderance of the evidence does not, however, support the hearing officer's decision that C.R. is conclusively "not a child who has an emotional disability" nor her purported directive to "delete the ED label from the Child's educational record." (ECF No. 4-46, at 19). Indeed, this component of the hearing officer's decision appears to have been part of her broader aim to have C.R. back at CBA and partially the result of a false understanding that the only impediment to C.R.'s reenrollment at CBA was the presence of the "ED" label on his IEP. In addition to considerable evidence of C.R.'s autism spectrum disorder diagnosis, there was more than negligible

evidence to suggest that C.R. exhibited the characteristics of emotional disability. Indeed, it was the Roses and their therapist Buxton who originally raised the concern that C.R. might need special education services for an emotional disability. See First Due Process Compl. at 3 (ECF No. 4-8, at 21). Accordingly, this report does not recommend affirming the hearing officer's finding beyond her conclusion that an emotional disability is not the primary adverse impact on C.R.'s educational performance. The result is nevertheless the same: "[h]is IEP must be redrafted to suit his educational needs" in light of his primary disability. Id.

Accordingly, the undersigned recommends that the court make a finding, consistent with that of the hearing officer's finding, that C.R.'s educational performance is not adversely affected primarily because C.R. has an emotional disturbance, as defined in § 300.8(c)(4).

### B. The Hearing Officer's Findings Regarding C.R.'s IEP and its Designation of an Appropriate Placement for C.R. Are Not Supported by a Preponderance of the Evidence, and the Parties Must Revise the IEP to Find a Suitable Placement, in Light of C.R.'s Primary Disability.

The hearing officer also found that Suffolk did not provide C.R. a FAPE because his IEP was not sufficient to confer educational benefit, without the proper disability designation. See (ECF No. 4-46, at 13-14). The hearing officer's central theory appears to have been that animosity between Buxton and

41

Suffolk officials led to a distrust and communication breakdown that resulted in a failure to accord appropriate weight to the diagnostic opinions of Buxton and Ellis.  Id. ("not the product of collegial information objectively shared").  As a result, C.R.'s IEP did not appropriately reflect the strong possibility of designating him as disabled by autism.

Again, the primary issue in an IDEA challenge is whether the school system provided the child a FAPE.  See 20 U.S.C. § 1415(f)(3)(E)(i).  And, "[a] school provides a FAPE by developing an . . . IEP[] for each disabled child."  Z.P. ex rel. R.P., 399 F.3d at 300.  To be sufficient under the IDEA, IEP's "must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress."  MM, 303 F.3d at 527; see 20 U.S.C. § 1414(d)(1)(A).  And, "[w]hether an IEP is appropriate and thus sufficient to discharge a school board's obligations under the IDEA is a question of fact."  Id. at 309 (citations omitted).  Accordingly, the hearing officer's finding on the appropriateness of an IEP is prima facie correct.  Hartmann, 118 F.3d at 1001; see also MM, 303 F.3d at 533 (4th Cir. 2002) ("The courts should, to the extent possible, defer to the considered rulings of the administrative officers . . . .").

Here, the hearing officer concluded that because C.R.'s IEP failed to take into account his autism, it was not appropriate. That is, without the proper disability designation, C.R.'s IEP did not contain accurate "statements concerning [the] disabled child's level of functioning." MM, 303 F.3d at 527. A preponderance of the evidence supports that finding.

While "the IDEA does not guarantee the ideal educational opportunity for every disabled child," King v. Bd. of Educ. of Allegany Cnty., Maryland, 999 F. Supp. 750, 767 (D. Md. 1998), there is a substantial nexus between properly categorizing the child's disability and the IEP's ability to confer a FAPE because that designation is a substantive component of the IEP, not a procedural misstep. See 20 U.S.C. § 1415(f)(3)(E). The IDEA mandates that "[e]ach local educational agency shall ensure that . . . the child is assessed in all areas of suspected disability." D.B. v. Bedford Cnty. Sch. Bd., 708 F. Supp. 2d 564, 578 (W.D. Va. 2010) ((quoting and adding emphasis to 20 U.S.C. § 1414(b)(3)(B)). And when the local educational agency fails to properly evaluate a child for a specific suspected disability and make eligibility determinations on that disability, the IEP cannot be appropriately crafted. Id. at 584 (holding that the school failed to provide a FAPE because it did not evaluate the child for specific learning disability in lieu of mental retardation).

Here, C.R.'s IEP for 2014-15 failed to properly consider the impact of C.R.'s autism spectrum disorder on his educational performance, in light of the expert evidence presented both during C.R.'s prior IEP meetings and to the hearing officer. After that error, the IEP's prepared for C.R. "could not have been 'reasonably calculated to enable the child to receive educational benefits.'" Id. (quoting Rowley, 458 U.S. at 207). Although the record suggests that it was the Roses who initially raised the prospect of labeling C.R. as emotionally disabled, see First Due Process Compl. at 3 (ECF No. 4-8, at 21), and that Dr. Hickman and the committee considered all fourteen disability categories at the relevant IEP meetings, Hearing Tr. at 256 (ECF No. 4-23, at 18), a preponderance of the evidence adduced at the due process hearing refutes the conclusion that an emotional disability is C.R.'s primary educational disability. See 34 C.F.R. § 300.8(c)(1)(ii) ("Autism does not apply if a child's educational performance is adversely affected primarily because the child has an emotional disturbance . . . ."). Rather, per the educational psychologists, autism and ADHD play a substantial role in "adversely affect[ing]" C.R.'s education performance. Id.

Accordingly, C.R.'s IEP must more fully account for C.R's autism spectrum disorder diagnosis and its effect on C.R.'s educational performance. To the extent that the hearing officer

found that C.R.'s IEP's did not do so, the undersigned recommends that the court affirm the hearing officer's decision.

But following her conclusion on C.R.'s primary disability and its effect on the IEP, the hearing officer also made a finding on C.R.'s placement. She concluded that C.R.'s placement at Rivermont was not "proper;" and that a placement at CBA "is appropriate." (ECF No. 4-46, at 16, 18). The hearing officer then ordered that C.R. be placed at CBA, unless CBA "is no longer available to [C.R.]." Id. at 19.

The hearing officer's findings regarding an appropriate placement are not supported by a preponderance of the evidence. See, e.g., A.B. ex rel. D.B. v. Lawson, 354 F.3d 315, 319 (4th Cir. 2004) (discussing the least restrictive environment requirement). Most plainly, this is because CBA is "no longer available" to C.R. See Jankowski Letter (ECF No. 26). In addition, the hearing officer drew conclusions regarding the substance of the placement which were contrary to the expert opinions on which she relied. Compare Hearing Officer Op. at 14 (ECF No. 4-46, at 16) ("The Hearing Officer does not agree that this Child's 'needs' dictate placement in a highly structured level system environment, with a timeout and decompression room, as provided at [Rivermont]."), with Gildea Report at 16 (ECF No. 25-2, at 16 ("[C.R.] would benefit from . . . the ability to go to a 'cool down' area when he becomes agitated or distressed.").

45

The hearing officer's analysis also rested on internal inconsistencies. She relied on Rose's preference for CBA and "concur[red]" with Rose that Rivermont was inappropriate, but also held that Suffolk erred by allowing the Roses to choose a placement from multiple options. (ECF No. 4-46, at 17). Finally, the hearing officer offered little analysis on the substance of the educational programming at the two schools. See, e.g., (ECF No. 4-46, at 16-17) ("[CBA's] environment is structured and [] students are required to respect one another"). Instead, the hearing officer "compared the two placements," and concluded that CBA was appropriate as the least restrictive environment for C.R. (ECF No. 4-46, at 17).

Moreover, the evidence of C.R.'s behavior in the past clearly suggests that therapeutic or other behavior-correcting special education services may be appropriate, notwithstanding C.R.'s designation as primarily autistic. That is, therapeutic services and/or a highly structured environment should not be foreclosed from consideration as an appropriate placement. E.g., Bobby v. School Bd. of the City of Norfolk, No. 2:13cv714, 2014 WL 3101927, at *5-7 (E.D. Va. July 7, 2014) (discussing the parents and school's agreement that autistic child was appropriately placed in a highly structured setting with a "dense level of reinforcement").

The hearing officer's placement decision was clearly an exercise of compare and contrast between Rivermont and CBA, rather than a substantive analysis of what school is "sufficient to confer some educational benefit upon [C.R.]." _MM_, 303 F.3d at 527; _see_ (ECF No. 4-46, at 16-17) ("This Hearing Officer also compared the two placements.") ("Upon review, the two placements are vastly different . . . .") ("On the other hand") ("By comparison").   This comparison primarily examined which placement would be least restrictive, with the hearing officer relying on reports of C.R.'s previous attendance to conclude that CBA would confer educational benefit.

But with CBA no longer an option, a preponderance of the evidence does not support a finding that a highly structured environment is inappropriate for C.R. to receive a FAPE. Therefore, the undersigned recommends that the court vacate the hearing officer's order to the extent that it directs attendance at CBA, or finds that Rivermont is an inappropriate placement. The undersigned further recommends that the court direct Suffolk and the IEP team to develop a new IEP and placement in accord with the requirements of the IDEA and C.R.'s primary disability of ASD.

## V. RECOMMENDATION

The undersigned RECOMMENDS that the court enter an order GRANTING in part the defendant Rose's motion for summary

judgment; DENYING the plaintiff Suffolk's motion for summary judgment; AFFIRMING IN PART the hearing officer's decision; VACATING the hearing officer's order directing that C.R. attend CBA; and ENJOINING the parties to meet, confer, and prepare a new IEP that identifies C.R. as disabled with autism for purposes of assessing his eligibility to receive special education and related services for the 2015-2016 school year, in addition to other health impairment – ADHD, and specific learning disability in written expression. Further, the recommended order should not be construed to foreclose any specific placement or the need for therapeutic services.

## VI. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.    A district judge shall make a <u>de novo</u> determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this

Court based on such findings and recommendations. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

/s/

Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
August 10, 2015